### EDWIN MOODY v. GEORGE W. FARR.

M. purchased at sheriff's sale, as the property of S., a certain town lot which had been purchased of the State by F., who had given a bond therefor to S. to convey to him the title upon payment of the purchase-money to him (F.), and M. alleged, in his bill against F. for the lot, that the purchase-money had been fully paid by S. to F. at the time M. made the purchase of the property at sheriff's sale. In his answer, F. denied that the purchase-money had been fully paid at the time M. purchased the lot, averring that S. and he had rescinded the contract, S. delivering back to him the title bond, which he had lost or destroyed, and he could not find it, and he (F.) had given notice at the sheriff's sale to M. of his (F.'s) claim to the lot; which bill was dismissed by the court. Afterwards M. filed another bill, which is the foundation of this action, against F., stating the same facts as alleged in the first bill in substance, and in addition charges, that the answer of F. to the first bill was false and fraudulent in denying the payment of the purchase-money for the lot by S. to F., and that the title bond to S. was lost or destroyed, and not in his possession; but that since the decree in the former suit, he has discovered that the bond was in F.'s possession at the time he made his first answer, and that it contained indorsed upon it evidence that S. had paid the purchase-money for the lot, &c., and praying that the former decree may be declared as having been produced by fraud, and that the title of the lot be confirmed to him (M.). F., in his answer, reiterates his former statements, denying positively that there was any entry of payment in full. upon the title bond, or that it was in his possession at or about the time of making his former answer; and he denies all fraud charged, and sets up by plea the former decree as a full bar to complainant's recovery. *Held*, that whether the bill be regarded as one filed to avoid a former decree on the ground of the fraud and perjury of the appellee in his first answer, or as a bill for a new trial founded on newly discovered evidence since the last hearing, it cannot be sustained.

This was neither a bill of review proper, nor a bill for a new trial, but a bill in the nature of a bill of review to avoid the previous decree for the fraud

Moody v. Farr.

of F. in suppressing the title bond: — *Held*, that it is the well-settled rule, that courts of equity will not set aside decrees, or grant new trials, upon evidence merely cumulative.

On appeal from the superior court of chancery; Hon. Charles Scott, chancellor.

· In the year 1840, complainant Moody filed his bill in chancery, stating that on the first Monday of August, 1839, he had purchased at sheriff's sale, as the property of John Shields, defendant in the execution, lot No. 4 in fractional square No. 1 south, in the city of Jackson, and received a sheriff's deed therefor.

Moody states, that at a public sale of town lots by the State, in November, 1833, Farr bought this lot at $1,299, and gave his notes, as required by law; and that "said notes have been duly paid, according to law."

That after the purchase of said lot, Farr sold it to John Shields, and gave him a title bond therefor, and said Farr received full payment therefor from Shields; that while Shields was thus the owner of said lot, the judgments under which the lot was sold to Moody were rendered against Shields, and became a lien on the lot; that subsequent to Moody's purchase, Farr repurchased said lot of Shields, and Shields returned to said Farr the title bond which Farr had given him. In the mean time, however, Farr had sold the lot to E. A. Young, and repurchased it at sheriff's sale, in order to fortify and confirm the title he was bound to make to Shields.

Subsequently Shields died, having no right to said property, and Moody purchased the dower of Mrs. Shields. At the time Moody purchased at sheriff's sale, Shields was in possession of said lot by a tenant, and Moody received possession of the same from Shields's tenant, and continues to hold the same.

Farr then commenced a suit of forcible entry and detainer against Moody, and obtained a judgment against Moody, which Moody was about to carry to a higher court, when both parties agreed that no further proceedings were to be had in that case, and that all further action should await and abide the decision of the rights of the parties in a court of chancery. Moody

charges, that inasmuch as Shields had paid for the lot at the time Moody purchased same at sheriff's sale, that the title become vested in him. Moody prays that Farr may be made a party defendant, that he may answer and discover the truth of the matters alleged, and produce the title bond given to Shields by Farr, and by Shields returned to Farr; that Farr may be divested of his pretended title, and Moody confirmed in his; and that Farr be perpetually enjoined from any further proceedings against Moody for said lot.

Farr, in his answer, admits that Moody bid off the lot at sheriff's sale in his presence, as stated by Moody, and that the same was sold as the property of John Shields, but says that he notified Moody that he, Farr, claimed the lot as his own property.

Admits that he purchased the lot originally as stated in the bill; that he gave his notes for the purchase-money, all of which were paid as stated in the bill. Admits that between the 5th and 15th of October, 1838, he sold the lot to John Shields for $6,000, $2,800 of which was paid down, the balance to be paid in Shields's obligations, or such other paper as Farr might receive in lieu thereof; and he gave Shields a title bond to make title as soon as the balance was paid. That in March or April, 1839, Shields found himself unable to perform his part of the agreement, and, therefore, Farr paid back to Shields the $2,800, and Shields redelivered the said title bond to Farr, and said bond has been lost or destroyed; that it was of no special value, and Farr took no care of it; has searched for and cannot find it. Farr denies that while Shields was in possession of said title bond, he, Farr, bought said lot at sheriff sale, but says he did purchase it at sheriff's sale before that time; that in 1835 he sold said lot to E. A. Young, received Young's notes, and transferred to Young the certificate of purchase received from the State. Farr obtained judgment on this note of Young, had the lot sold under that judgment, and bought it at sheriff's sale, but says Young retransferred the certificate of purchase to him, Farr, and so no deed was made by the sheriff.

Farr charges that the purchase-money was not all paid, and that the bond for title was redelivered, and the sale to Shields

rescinded; and that, therefore, Shields had no such title as could be sold at sheriff's sale, and that Moody took nothing by his purchase.

He further says, that at the time of Moody's purchase, he, Farr, was in possession of the lot by his tenant, and so remained until October or September, 1839, when Farr's tenant was unlawfully put out of possession. Farr makes his answer a cross-bill, and requires Moody to answer the same.

To the cross-bill, Moody admits that Farr was present at the sheriff's sale, when he (Moody) bid off said lot, and that Farr did claim said lot; but before Farr made known his claim, Farr himself bid for the lot at said sale. When Moody commenced bidding, Farr claimed the lot, but it was struck off to Moody, and Farr then made a conditional bargain with Moody to take Moody's bid off his hands.

Moody denies on information and belief, that Shields had not paid all the purchase-money to Farr at the time Moody purchased the lot, and denies that the pretended rescission between Shields and Farr had taken place at that time, but says the pretended rescission was subsequent to Moody's purchase; that it was not a rescission, but a repurchase, and that said property was liable to the satisfaction of executions against Shields, under which Moody purchased.

Moody also insists that the sheriff's sale at which Farr bid off the lot was after the sale by Farr to Shields, and that Farr ordered the sheriff to make the deed of said sale to Shields. Moody denies that Farr was in possession of said lot at the time Moody purchased, but that H. S. Baldwin was in possession at that time, holding under a lease from John Shields, which lease is exhibited. This lease bears date November 9, 1838, from John Shields to H. S. Baldwin, and is witnessed and proved in this case by Mr. Craft.

W. C. Demoss, sheriff, testifies that in the year 1838, he, by virtue of an execution against E. A. Young, sold said lot at sheriff's sale to defendant, George W. Farr, and believes Farr ordered him to make title to Shields.

William Albertson testifies, that on the 10th of March, 1839, he was a juror on the trial of the right of property in lot num-

ber 4, fractional square 1 south, between H. J. Baldwin and A. Wilson; that Shields was then present and exhibited a title bond from Farr to him for said lot; that George W. Farr was also present and stated that Shields was the owner of said lot; that he had given Shields a title bond to the lot, and had purchased said lot at sheriff's sale, and ordered the sheriff to make the deed to Shields.

A. N. Hutson was a juror on the same trial, and heard Farr testify that he had purchased the lot at sheriff's sale, and authorized the sheriff to make the deed to Shields; that it was Shields's property; that Shields had made all the payments.

D. Shelton says he drew the title bond from Farr to Shields on or before the 11th of October, 1838.

C. M. Hart states that he was present on the day Moody bought the lot at sheriff's sale; that Farr gave notice to the bystanders that the lot was his, and that Shields had no right to it until he had paid him for it; he stated that Shields had paid him a part.

James F. Farr, brother of defendant, testifies that at the time Moody bought the lot, G. W. Farr, his brother, was in possession of it, by a tenant by the name of Stevenson; says Moody got possession from Stevenson, who was his brother's tenant; says he saw Stevenson on the lot, and heard his brother say Stevenson was his tenant; witness obtained all his knowledge from his brother, the defendant.

Josiah Hicks states, that from a conversation between Baldwin and defendant, in the spring of 1839, he inferred that Baldwin was a tenant of Farr, but does not know how Baldwin came in possession of the lot.

A. Robertson says he was present when Farr agreed with one Stevenson, that Stevenson should have one room of the house for five dollars per month, and Stevenson was to keep the other rooms open in the daytime and shut at night.

John P. Oldham says that on the 11th day of March, 1839, there was a case of forcible entry and detainer before him, as justice of the peace, between Andrew Wilson and Henry J. Baldwin, for the possession of the house and lot in question; that George W. Farr was witness for defendant; that said

Moody v. Farr.

Farr exhibited a deed to himself, from the sheriff of Hinds county, for said lot; and on the same occasion, a title bond was exhibited from Farr to Shields; says Shields and Farr conversed about the matter in his presence. Shields said the time had expired when Farr was to make him a deed, and he could recover the penalty of the bond, and Farr did not deny it.

On these pleadings and proofs, Chancellor Buckner dismissed the bill and the cross-bill, June 15, 1843.

On the 18th of May, 1847, Moody filed his second bill reiterating the facts of his former bill, and making the proceedings thereon a part, and charging that the former decree dismissing his bill, was obtained by the fraud of Farr. He charges specifically that the purchase-money was paid to the State by Farr, and the purchase-money by Shields to Farr, on their contract of sale, was also paid before his own purchase occurred; that Shields had possession of said lot from the date of his purchase in 1838, until Moody purchased, and that Moody obtained possession from a tenant of Shields; that he had defeated Farr in the case of unlawful detainer in the circuit court; that within the last year, Farr had commenced an action of ejectment against Moody for this lot; that Farr had previously commenced an action of ejectment against Moody for the same lot, and suffered a nonsuit; that subsequently, and after Moody had purchased the property, and had long been in the possession of the same, Farr fraudulently procured a patent from the State to this lot of land, and having done this, recommenced his action of ejectment.

Moody then charges that Farr's answer to Moody's former bill was false and fraudulent in denying the full payment of the purchase-money by Shields to Farr, and in denying that the title bond was at that time in his possession, and in stating that the same was lost or destroyed; charges that since said decree of dismissal, he has discovered that said Farr was at that time in possession of said title bond, and that it contained indorsed upon it the evidence that Shields had paid the purchase-money for said lot, as charged in this former bill, and that Farr fraudulently and falsely withheld the same. He charges that on the 16th day of December, A.D. 1840, said Farr

withdrew said title bond from its file in the clerk's office of the circuit court of Hinds county, and gave his receipt therefor to said clerk, on the 16th day of December, 1840; that notice of Moody's first bill was served by the sheriff on Farr, on the 7th day of September, 1840, wherein Farr was called upon to produce said title bond. On the 16th day of December, he procured possession of this bond from the clerk of the circuit court, and on the 19th day of December, 1840, only three days after he obtained possession of the same, filed his answer, wherein he swore that he had not the possession of said bond, and that the same had been lost or destroyed. Moody exhibited, also, an affidavit of said Farr, dated March 8, 1844, wherein he admits the possession of said title bond at his house.

In reply to the charges of this bill, Farr admits that he obtained the patent to the lot, as stated in the bill, but denies that the same is a fraud; denies all the other allegations of fraud; admits the signing of the receipt to the circuit clerk, but says said title bond was not included in that receipt.

The affidavit of said Farr in the circuit court of Hinds county of March 8, 1844, admitting possession of said bond, is neither admitted nor denied; but the decree in the former case is plead in bar of the relief sought by this bill.

Henry S. Foote testifies that he was counsel for Farr before the magistrate's court at Raymond, in the case of forcible entry and detainer spoken of, and also in the same case before the circuit court; that some such bond for title as that described by Moody was exhibited on the trial before the magistrates in Raymond, and that his impression is, that the payment of the whole purchase-money was in some way or other made so evident by that instrument, that he advised Mr. Farr that its introduction could be of no service to him, and must do him injury.

*John D. Freeman,* for appellant,
Filed an elaborate written argument.

*D. C. Glenn* on the same side.

*D. Shelton,* for appellee,

Moody *v.* Farr.

In reply, cited 2 Smith, Ch. Pr. 58; Metc. Eq. Pl. 84, 85; 1 P. Wms. 733; 2 Ib. 73; 2 Smith, Ch. Pr. 56, 57; Metc. 78, 79, &c.; 1 Vez. Sr. 430; 2 Ib. 571, &c.; 1 P. Wms. 283; 17 Ves. 177; 2 Smith, Ch. Pr. 53; 3 Johns. C. R. 126; 2 Mad. Ch. 539; Metc. Pl. 79; 2 Paige, 45; 1 McCord, Ch. R. 29; 16 Ves. 87; 6 S. & M. 723; 11 Ib. 411; 18 Johns. C. R. 489; 16 Ves. 398; 1 Hen. & Munf. 180; 16 Ves. 88, &c.; 8 Johns. Ch. R. 84; 15 Ib. 210; 1 Ves. & B. 151; 4 Johns. R. 425; 5 Ib. 248; 4 Ib. 255; 14 Ib. 186; 3 Cushm. 492; 4 Ohio, 92; 6 Binn. 135; 5 S. & M. 499; Ib. 730; 6 Ib. 100; 2 T. R. 53; Cowper, 621; 2 Dall. 93; 10 Serg. & Raw. 63; 3 Har. & Johns. 426; 4 Taunt. 16.

Mr. Justice HANDY delivered the opinion of the court.

The controversy in relation to the property involved in this suit has been heretofore before this court in a case reported in 6 S. & M. 100.

That was a bill filed by Moody against Farr in the superior court of chancery, to confirm the title of the former to a town lot in the city of Jackson, which Moody had purchased at sheriff's sale as the property of one John Shields, and which had been purchased of the State of Mississippi by Farr, who had given a bond therefor to Shields to convey to him the title upon payment of the purchase-money to Farr, alleging that the purchase-money had been fully paid at the time of Moody's purchase of the property at sheriff's sale. Farr denied in his answer that the purchase-money had been paid by Shields, and stated that before the purchase of Moody at sheriff's sale, the contract was rescinded by him and Shields, who delivered back to him his title bond which he had lost or destroyed, and it being of no special value, that he had taken no care of it, and could not find it; and that he gave notice to Moody at the sheriff's sale of his claim to the lot. Much testimony was taken in the case, and upon final hearing, the bill was dismissed by the chancery court, and that decree was affirmed by this court.

Afterwards, Moody filed the bill now before us, which, after stating the same facts as alleged in the previous bill in substance, charges that the answer of Farr to that bill was false and

fraudulent in denying the payment of the purchase-money by Shields to Farr, and that the title bond to Shields was lost or destroyed and not in his possession, stating that since the decree in the former suit, he has discovered that the bond was in Farr's possession at the time he made his answer, and that it contained indorsed upon it evidence that Shields had paid the purchase-money for the lot, and that by the suppression of this bond and his false answer, he fraudulently procured the decree dismissing the former bill, and praying that the former decree may be declared void as having been procured by fraud, and that the title to the lot be confirmed in Moody.

Farr answers reiterating the statements of his former answer, denying positively that there was any entry of payment in full upon the title bond, or that it was in his possession at or about the time of filing or making his former answer, or that he had shortly before that time received it from the clerk of the circuit court of Hinds county, where the bill alleges it had been deposited in another suit in relation to the property pending in that court. He states that the bond for which he gave a receipt to that clerk, was not this title bond, but another paper which he withdrew from that suit and handed to his counsel for the purpose of aiding him in drawing his answer to the former bill, and that it has remained in his possession ever since. He denies all fraud charged, and sets up by plea the former decree, as a full bar to the complainant's recovery.

Upon the final hearing the chancellor dismissed the bill, and from that decree this appeal is taken.

The bill now before us may be considered in two points of view: 1st, as a bill to avoid the former decree on the ground of the fraud and perjury of the appellee in his answer in that suit; and 2d, as a bill for a new trial founded on evidence that has come to the knowledge of the appellant since the hearing of the former cause.

1. The fraud charged is this, that the title bond to Shields contained written evidence upon it, that the entire purchase-money had been paid by Shields; that this bond was in the possession of the appellee when his answer was made in the former suit, which fact he falsely denied in that answer, stating

that it was lost or destroyed and could not be found, and refused to produce the paper because he knew that it would establish the fact of payment as alleged. This charge is positively denied by the answer, and there is much conflict upon the point among the witnesses for the respective parties. The effort of the appellant was to show that this bond was in the appellee's possession while a suit in relation to the property was pending between these parties in Hinds circuit court, and before the answer of Farr was made; that it was on file in that suit, and was withdrawn by Farr but three days before his answer was made. The testimony on this point seems to be irreconcilable. Foote, who was Farr's counsel in that suit, states that the bond was exhibited at the trial, but that he advised Farr that it would be injurious to his case to introduce it, because it bore evidence of payment of the purchase-money upon it. It is scarcely probable, then, that it was introduced. Yet Hardwick proves that it was introduced by Farr; that it had been cancelled; that he knows of no written acknowledgments of payment upon it, and that the ground of the verdict in favor of Farr was, that there was no proof of compliance with the terms of the bond by Shields. This witness was one of the jury in the case. The deputy clerk of Hinds circuit court proves that there is a receipt on file in said suit, signed by Farr, dated 16th of December, 1840, acknowledging the withdrawal of certain papers in these words, "title bond and certificate of purchase withdrawn by me;" and there is also on file in that court an affidavit made by Farr in 1844, in answer to a notice to produce a title bond to be used on a trial between Farr and Moody, assigning as a reason for not producing the bond, that he had it not with him at the time, and that he had not time to go home, which was distant several miles, and return in time to produce it at the trial. If this affidavit has reference to the bond in question in this suit, it goes very far to show that he then had the paper in his possession. Admitting that he had the bond in his possession, the next question is, did it show a receipt for the purchase-money. The testimony on this point is also conflicting. Foote states in substance that the payment of the purchase-money was apparent from the bond, while Hardwick states to

67 *

the effect that there was no payment written on it. John T. Farr proves that he saw the bond in the possession of the appellee in 1839, after the contract was rescinded, and there was no receipt or indorsement on it. James W. Farr testifies to the same effect. These appear to be all the witnesses who testify upon the point of payment being indorsed upon the bond, and it is manifest that the preponderance is against the receipt of payment appearing upon it. The witness Foote does not speak from positive recollection, while John T. Farr speaks positively that the payment was not indorsed, and Hardwick states circumstances showing clearly the same thing, namely, that this was a material and controlling fact on the trial between Farr and Moody, in which he was one of the jury, and that the verdict was in favor of Farr, which would not have been the case if the purchase-money had appeared to have been paid by Shields to Farr, by a receipt indorsed on the bond. And the testimony of these witnesses is sustained by the probabilities of the matter. If the contract had been rescinded, it is not to be supposed that Farr would have indorsed a payment on a bond which had not been paid, but simply cancelled. If it was not rescinded, is it probable that he would have possession of the title bond, the property of Shields and his only evidence of title? And if the purchase-money had been paid in full by Shields, is it in the least probable that Farr would have had possession of the bond, without having executed a deed for the land, which he does not appear to have done; or if he had taken it up by making a deed, is it at all probable that he would have entered upon it that he had received the purchase-money? These considerations go to strengthen the testimony in favor of Farr, and we are brought to the conclusion from the whole evidence on this point, that the fact of payment indorsed on the title bond is not sufficiently established. Without this, the present bill could not be maintained; for it is immaterial whether Farr had possession of the title bond or not if it did not contain evidence that the purchase-money was paid. The fraud complained of against Farr was not simply the non-production of the bond, for that could have worked no injury to Moody, but it was that the bond so suppressed contained conclusive evidence of payment,

which would have secured the property to Moody. When this fact is not sufficiently established, the foundation of the bill is taken away.

2. Upon the point of newly discovered evidence, apart from the alleged indorsement on the bond, the bill does not properly present any such ground of relief. It is neither a bill of review proper, nor a bill for a new trial, but a bill in the nature of a bill of review to avoid the previous decree for the fraud in suppressing the bond to the complainant's injury. Story's Eq. Pl. § 426. To that object, therefore, must the case be confined. But if it was a bill for a new trial, the testimony in the record introduced since the former decree to show that Farr had received payment in full of the purchase-money, would be insufficient, because it is cumulative. That was the very point attempted to be established in the former suit, and the additional testimony to the same point cannot be the ground for avoiding the former decree. For it is well settled that courts of equity will not set aside decrees or grant new trials upon evidence merely cumulative.

We are, therefore, of opinion that the decree dismissing the bill is correct, and it is accordingly affirmed.